### In re ANSPACH.

[Cite as *In re Anspach* (2000), 136 Ohio App.3d 535.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 17794.

Decided Jan. 28, 2000.

*Mathias H. Heck,* Montgomery County Prosecuting Attorney, and *Cheryl A. Ross,* Assistant Prosecuting Attorney, for appellee.

*Mary K.C. Soter,* for appellant.

FAIN, Judge.

Defendant-appellant, Scott Alan Anspach, appeals from an order denying his application to have his juvenile records sealed. Anspach argues that the trial court abused its discretion by denying his application for the sole reason that he refuses to admit guilt regarding the offense for which he was found delinquent.

We conclude that the trial court did not abuse its discretion in denying Anspach's application to have his juvenile records sealed, because the evidence in the record shows, among other things, that Anspach has vacillated between accepting and denying responsibility for the offenses for which he was found delinquent. Therefore, there is evidence in the record supporting the trial court's determination that Anspach's rehabilitation has not been attained to a satisfactory degree. Accordingly, the judgment of the trial court is affirmed.

I

In April 1991, a group of juveniles, including Anspach, who was then sixteen years old, gathered at one of their houses at around midnight. Two of the juveniles drew up a plan to burglarize the house of Judith Simpson, and to conceal their burglary by setting fire to the house afterwards. The other juveniles, including Anspach, agreed to act as lookouts. The group went to Simpson's residence, where two of the juveniles broke into the house and

removed a microwave oven from the kitchen, while Anspach and the others remained outside, as lookouts. One of the juveniles who broke into the home saw Judith Simpson asleep on the couch. At this same time, Judith's twelve-year-old daughter, Amanda, was asleep elsewhere in the house. Failing to find anything else to steal, the juveniles poured gasoline around the kitchen, and lit a fire. All of the juveniles, including Anspach, then ran from the home. Both Judith and Amanda were injured in the fire. Amanda died from her injuries shortly thereafter.

A complaint was filed against Anspach in the juvenile division of the Montgomery County Common Pleas Court, charging him with delinquency for having committed the crimes of aggravated murder and aggravated burglary. The state initially moved to have Anspach's case transferred to the general division so that Anspach could be tried as an adult. However, the state agreed to dismiss its motion to transfer, after Anspach agreed to admit delinquency for having committed involuntary manslaughter, and aggravated burglary. The trial court found Anspach delinquent for having committed those offenses, and committed him to the custody of the Department of Youth Services for a minimum term of one year, and a maximum term not to exceed the attainment of his 21st birthday.

The Department of Youth Services committed Anspach to the Training Institute of Central Ohio ("TICO"), where he obtained his GED (*i.e.*, the equivalent of a high school diploma), graduated from a drug education course, and enrolled in a vocational course. On August 7, 1992, Anspach moved for an early release hearing. A hearing was held on Anspach's motion on September 3, 1992. The following day, the trial court issued an order denying Anspach's request for early release. On October 5, 1992, Anspach moved to have the trial court reconsider its decision denying him early release. On October 14, 1992, the trial court issued an entry, wherein it concluded that it lacked jurisdiction to grant a juvenile delinquent an early release after he has served the minimum sentence. The Department of Youth Services refused to grant Anspach early release in November 1992, after both a youth counselor and casework supervisor jointly wrote a letter to the department's administrator, advising her that the trial judge who had committed Anspach to the department's custody wanted him to complete his time, that the victim's relatives had voiced their concerns through television and the local newspaper on a regular basis, and that it was apparent to them that Anspach's safety and security were at risk.

On November 9, 1995, Anspach was released from the custody of the Department of Youth Services. On March 12, 1999, Anspach filed a request for sealing of records. Anspach requested that his juvenile records, which included the involuntary manslaughter and aggravated burglary charges from 1991, as well as a breaking and entering charge from 1990, be sealed, pursuant to R.C.

**538**

2151.358(D). The state filed an objection to Anspach's motion. A hearing on the matter was held on April 12, 1999. On April 29, 1999, the trial court issued an order denying Anspach's request that his juvenile records be sealed, which stated that "Anspach has not yet fully recognized his culpability in these matters and therefore he has not attained a satisfactory degree of rehabilitation."

Anspach appeals from the trial court's April 29, 1999 order.

## II

Anspach's sole assignment of error on appeal states:

"The juvenile court abused its discretion in refusing to grant the application for expungement [1] of the defendant–appellant solely because he did not admit guilt."

Anspach argues that the trial court abused its discretion by denying his application to have his juvenile record sealed, because, he has been living "an exemplary life" since his release from the Department of Youth Services in November 1995, and, therefore, the mere fact that he refused to admit culpability for the crimes that caused him to be committed to the department could not have provided the trial court with an adequate basis for refusing to seal his records. We find Anspach's arguments unpersuasive.

■ A person who has been adjudicated a delinquent child and committed to the Department of Youth Services may apply to the court for an order to have his record sealed two years after his unconditional discharge from the agency. R.C. 2151.358(D). "If the court finds that the rehabilitation of the person who was adjudicated a delinquent child * * * has been attained to a satisfactory degree, the court may order the record of the person sealed." *Id.* R.C. 2151.358(D) leaves the decision as to whether a record should be sealed to the discretion of the trial court. A trial court does not abuse its discretion unless its decision is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149.

Several courts in this state, including this one, have recognized that a close nexus exists between a defendant's willingness to acknowledge his guilt and

---

1. As the state has noted in its brief, throughout the proceedings held in the trial court, the terms, "seal" and "expunge" were used interchangeably. For clarification, R.C. 2151.358(D), which permits a person to apply to have his juvenile records *sealed*, applies in cases where the person was adjudicated a delinquent child or a juvenile traffic offender. R.C. 2151.358(F), which permits a person to have his juvenile records *expunged*, applies only in cases where the person was charged with being a delinquent child or a juvenile traffic offender, and was subsequently adjudicated not guilty of the charges in the case, or where the charges were dismissed. Where a child has been adjudicated delinquent, unruly, or a juvenile traffic offender, his records may be sealed, but not destroyed. See Kurtz & Giannelli, Ohio Juvenile Law (1999), 403, Section 32.4.

accept responsibility for crimes of which he has been convicted, and his prospects for rehabilitation. Thus, this court has said, "[i]t is thought proper to recognize a defendant's acknowledgment of guilt in sentencing because a defendant who admits guilt has shown a willingness to assume responsibility for his conduct and has taken the first and arguably essential step toward rehabilitation." *State v. Patterson* (May 2, 1997), Montgomery App. No. 15699, unreported, 1997 WL 216576, citing, *inter alia, Brady v. United States* (1970), 397 U.S. 742, 753, 90 S.Ct. 1463, 1471–1472, 25 L.Ed.2d 747, 759. In *State v. Mitchell* (1997), 117 Ohio App.3d 703, 691 N.E.2d 354, the court upheld a trial court's decision to impose a lengthier sentence on a defendant after he had refused a plea bargain, where the trial court had based its decision on the ground that the defendant refused to accept responsibility for his actions, in direct contravention of unrebutted evidence of his guilt, and, instead, blamed his conviction on perjured police testimony, incompetent counsel, and an unfair judge, all of which, the trial court found, reflected poorly on the defendant's prospects for rehabilitation, and militated against imposing a lesser term of incarceration. *Id.* at 707, 691 N.E.2d at 356–357. See, also, *State v. Hill* (Feb. 17, 1993), Lorain App. No. 92CA005332, unreported, 1993 WL 36084 (upholding trial court's decision to give one defendant a harsher sentence than another who had pled guilty and showed remorse for his crimes, on the ground that first defendant, who had not admitted culpability, was not a likely candidate for rehabilitation).

■ .Notwithstanding the above observation, it is conceivable that a juvenile defendant may choose to admit delinquency, rather than risk being bound over to be tried as an adult, even if the juvenile sincerely, and perhaps even correctly, believes he is innocent of the offense forming the basis of the delinquency charge. Where a person has admitted delinquency in that kind of a circumstance, has consistently maintained his innocence since that time, and there is no overwhelming evidence to contradict his assertions of innocence, then it *might* constitute an abuse of discretion for a trial court to refuse his request to have his records sealed, assuming that the person has otherwise led a law-abiding and productive life, after having been released from custody. Anspach essentially argues that he falls into this category, but the record demonstrates otherwise.

First, as the trial court observed, Anspach has vacillated between admitting and denying responsibility for his role in Amanda Simpson's death. By admitting delinquency in 1991 for involuntary manslaughter and aggravated burglary, Anspach was able to avoid being tried as an adult. However, during the September 3, 1992 hearing held on his motion for early release, Anspach denied having committed those acts. About one month later, Anspach wrote a letter to the trial court wherein he retracted his September 3 denial of his involvement, explaining that he denied the charges at that time because he became afraid

when he saw that television cameras and members of the community were present for the hearing. Anspach wrote that someone in the community had sent him a threatening letter saying that if he was released, he [Anspach] "would be sorry." Anspach said that he believed that if he denied involvement, "everybody would change their minds" about him. Anspach informed the trial court that if it would give him a "closed-court" hearing, without any television cameras or community members present, he would tell the prosecutor why he denied the charges, and would admit to them.

Nevertheless, at the hearing held on his application to seal records, Anspach again denied any responsibility for Amanda Simpson's death, and complained about being the victim of a "bum rap." Anspach testified that the only reason he had pled guilty to the charges against him was because he "knew [he] didn't have a chance." Anspach accused the prosecutors who brought the charges against him in 1991, of bribing witnesses to offer testimony against him. He also called the public defender who represented him during the 1991 incident a "crooked lawyer." Shortly thereafter, Anspach denied having called his public defender a crooked lawyer, but continued to insist that he had been biased against him. Anspach testified that his public defender had refused to contact witnesses that Anspach had asked him to contact, and that he had told Anspach that "he wanted to see [Anspach] get sent up for it," because he thought Anspach was guilty. After having made the foregoing accusations of serious misconduct against the prosecutors and his own counsel in the 1991 case, Anspach was called upon to read, in open court, the following comment a psychologist had made about him in a 1991 report, prepared shortly after Amanda Simpson's death:

"[Anspach] will seemingly go to great lengths to avoid accepting responsibility for his actions and tends to project accountability onto others or may distort information to present himself in an idealistically positive way. His lack of insight into personal difficulties, lack of ability to learn from past experiences, and strong need to have his desires fulfilled immediately will likely make achieving progress in treatment extremely difficult."

The evidence presented by Anspach showed that he has made some progress since 1991. While he was at TICO, he obtained his high school equivalency diploma. He also began writing poetry during this period; at least two of his poems were published. Since being released from the Department of Youth Services, Anspach has met a nursing student, whom he plans to marry when she graduates in December 2000. Anspach has since moved in with his fiancee's family, and the evidence shows that he gets along well with all members of that family. Furthermore, Anspach has not been convicted of any crimes since being released from custody.

Nevertheless, Anspach's claim that he has led an exemplary life since being released from custody is not supported by the record. Anspach has done nothing to further his education in order to increase his job skills and opportunities, which was one of the goals set out for him on his release from the Department of Youth Services in 1995. Although Anspach complained about a lack of money, he apparently has made no effort to obtain a grant to further his education. Furthermore, as the state points out, Anspach's employment history has been "spotty." He has been terminated from employment on at least three occasions. On one of the occasions, he was fired for threatening his supervisor. He obtained his current job, at a pet store, approximately two weeks before the scheduled hearing.

In light of the foregoing, the trial court did not abuse its discretion in denying Anspach's application to seal his juvenile records. Accordingly, Anspach's assignment of error is overruled.

### III

Anspach's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

GRADY, P.J., and WOLFF, J., concur.