OPINION
In October 1996, Wayne K. Auge, M.D., an orthopaedic surgeon then-licensed in Ohio, was found guilty by a Franklin County jury of a single count of illegal processing of drug documents, a fourth-degree felony. At the close of the state's case, pursuant to Crim.R. 29, the trial court granted a defense motion to dismiss a second count which had alleged a similar incident on another date.
Dr. Auge was sentenced to one year of incarceration, which was suspended upon the condition that he serve sixty days in the Franklin County Jail. The trial judge also placed him on two years' probation and suspended his driver's license for six months. In addition, he was ordered to pay a fine of $1,500. The record also indicates that the doctor's licenses to practice medicine in both Ohio and California were suspended as a result of his conviction.
Dr. Auge appealed his conviction and sentence to this court, which affirmed the judgment of the trial court in State v. Auge (1997), Franklin App. No. 96APA12-1753 ("Auge I").
We glean the essential facts underlying Dr. Auge's conviction from Auge I. The evidence adduced at trial revealed that on August 4, 1993, Auge wrote a prescription for Winstrol, a controlled substance, in the name of a fictitious person but intended for his own use. After writing the prescription in the fictitious man's name, the doctor went to a pharmacy to fill it. Winstrol is an anabolic steroid which has been linked to misuse by "bodybuilders;" the doctor's physical appearance was consistent with that of a bodybuilder, in the opinion of at least one pharmacist. The doctor testified in his own defense at trial, denying that he committed the offense.
Dr. Auge moved to New Mexico and obtained a "restricted" license to practice medicine there in May 1997 with, as a result of his Ohio conviction, "stipulation[s] and monitoring of his practice." After successfully completing the "monitoring" period, all restrictions were removed pursuant to an order of the New Mexico Board of Medical Examiners in September 1999. Since that time, the doctor has practiced in New Mexico with full privileges and no adverse incidents.
On February 5, 2001, Dr. Auge filed an application to seal/expunge his record of conviction, pursuant to R.C. 2953.32. The record reveals that the doctor's primary reason for seeking expungement is his current inability to become "board-certified" by the American Board of Orthopaedic Surgery, which threatens the privileges he currently has at the three hospitals he services. According to the doctor, the bylaws of most hospitals in the United States require orthopaedic surgeons to be board certified. Additional reasons given by the doctor are discussed infra.
Pursuant to R.C. 2953.32(A)(1), the application was assigned to the "sentencing court" to the judge who presided over Dr. Auge's trial. In a similar vein, the same assistant prosecuting attorney who tried the case filed an objection to the application. In turn, Auge's counsel filed a reply memorandum, with numerous letters attached offering support from many of his medical colleagues in New Mexico, including the president of the New Mexico Board of Medical Examiners, John S. Romine, M.D.
As further required by statute, the trial court scheduled a hearing on the application.
On April 27, 2001, Dr. Auge's counsel filed a motion seeking an order requiring the "probation department to interview [Auge's] professional and nonprofessional peers * * * and the Medical Board in New Mexico" or to "permit depositions to be taken." The prosecution filed a memorandum contra, arguing, inter alia, that interviewing and/or deposing "expungement witnesses" would be both unjustifiably expensive and basically duplicative, given the fact that numerous letters appended to Auge's pleadings were already in the record. The trial court agreed and overruled the motion pursuant to a decision and entry journalized June 13, 2001. However, the trial court did permit the letters, construed as affidavits, to be introduced into evidence as exhibits at the hearing.
The hearing occurred on August 23, 2001. Dr. Auge was the only witness to testify and the only party to present evidence. At the conclusion of the hearing, the court indicated that the matter would be "taken under advisement." Pursuant to a decision and entry journalized October 12, 2001, the trial court denied Dr. Auge's application to seal his record.
Wayne K. Auge (hereinafter "appellant") has timely appealed, assigning three errors for our review:
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S APPLICATION TO SEAL HIS CRIMINAL CONVICTION.
ASSIGNMENT OF ERROR NO. 2
 THE EVIDENCE BEFORE THE TRIAL COURT MANDATED THE CONCLUSION THAT THE INTERESTS OF APPELLANT IN HAVING HIS RECORD SEALED OUTWEIGHED ANY LEGITIMATE NEEDS OF THE GOVERNMENT TO MAINTAIN THE SAME.
ASSIGNMENT OF ERROR NO. 3
 THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION THAT THE PROBATION DEPARTMENT INTERVIEW HIS PEERS IN NEW MEXICO OR ALLOW DEPOSITIONS.
As indicated infra, applications to seal/expunge criminal convictions are governed by R.C. 2953.32[1], which provides, i n relevant part:
 (B) Upon the filing of an application * * *, the court shall set a date for a hearing and shall notify the prosecutor for the case of the hearing on the application. The prosecutor may object to the granting of the application by filing an objection with the court prior to the date set for the hearing. The prosecutor shall specify in the objection the reasons for believing a denial of the application is justified. The court shall direct its regular probation officer, a state probation officer, or the department of probation of the county in which the applicant resides to make inquiries and written reports as the court requires concerning the applicant.
(C)(1) The court shall do each of the following:
 (a) Determine whether the applicant is a first offender * * *;
 (b) Determine whether criminal proceedings are pending against the applicant;
 (c) If the applicant is a first offender * * *, determine whether the applicant has been rehabilitated to the satisfaction of the court;
 (d) If the prosecutor has filed an objection * * *, consider the reasons against granting the application specified by the prosecutor in the objection;
 (e) Weigh the interests of the applicant in having the records pertaining to the applicant's conviction sealed against the legitimate needs, if any, of the government to maintain those records. [Emphasis added.]
Case law interpreting this statute makes it abundantly clear that it is remedial in nature, and "must be liberally construed" to promote the statute's purpose of allowing appropriate applicants to seal their records. State ex rel. Gains v. Rossi (1999), 86 Ohio St.3d 620. See, also, State v. Hilbert (2001), 145 Ohio App.3d 824; In the Matter of: M.B. (2000), Franklin App. No. 99AP-922.
The provisions emphasized above, (c) and (e), underlie the crux of this appeal. At the hearing, the state's objection to appellant's application was based solely upon factor (c), theorizing that appellant should not be deemed "rehabilitated" since "he has never admitted any guilt in connection with his crime."
Appellant's testimony was the only evidence introduced at the hearing, including the letters/affidavits in support of his application. In the words of the prosecutor at the hearing, appellant has "done wonderful things" professionally in New Mexico. (Tr. 53.)[2] In particular, the doctor has devoted much of his professional time to treating impoverished persons, including the local Native American population, in extremely rural areas who would otherwise be without medical care. Because the rural area in which he practices is so impoverished, and otherwise "undesirable," the medical community there has trouble attracting physicians. Appellant and his partner are the only orthopaedic surgeons practicing in three hospitals.
Appellant has also shared his abilities and skills with other physicians in other parts of the world, including so-called "third-world countries," where he has traveled both to teach and to perform surgery, free of charge, for the desperately "needy." He has also authored several articles in his area of practice, has won several awards, and has worked with the New Mexico Medical Board to implement safeguards to prevent the misuse of prescription drugs. In short, the correspondence from appellant's colleagues reveal a highly respected, dedicated and skilled surgeon.
Again, the prosecution did not challenge in any way the substance and/or veracity of these accolades of appellant's achievements, via his own testimony and the supporting letters.
Turning now to appellant's first assignment of error, he argues that the trial court abused its discretion in denying his application by essentially imposing a condition precedent into the statute as to the rehabilitation determination; the judge required an admission of guilt to the offense for which he stood trial and was convicted.
It is well-established that the rigorous "abuse of discretion" standard requires a reviewing court to determine whether the lower court acted in an unreasonable, arbitrary, or unconscionable manner. Furthermore, a reviewing court generally may not substitute its judgment for that of the lower court. See, e.g., State v. Adams (1980), 62 Ohio St.2d 151, 157; State v. Xie (1992), 62 Ohio St.3d 521.
As indicated above, the trial court denied appellant's application based solely upon factor (c), concurring with the prosecutor's contention that appellant should not be deemed "rehabilitated" because he purportedly refused to acknowledge his guilt. In its decision denying the application, the trial court, alluding to the dearth of case law directly on point, explained its reasoning as follows:
 * * * Rehabilitation is defined in Black's Law Dictionary as "restoring to a former capacity; reinstating; to be qualifying again". Without a candid acknowledgement of his guilt, the Applicant can simply not be `restored or qualified again.' Rehabilitation must, in this court's analysis, involve an individual admitting and acknowledging his guilt and a subsequent change in his character so as to ensure no future criminal conduct or breach of public trust.
* * *
 [Appellant] will argue that he has provided evidence that he is law abiding, has not re-offended and is therefore rehabilitated. Prior to this incident[,] * * * [appellant] was otherwise law abiding and working. [Appellant] cannot be rehabilitated until he candidly admits that he committed a criminal offense and can state unequivocally that he will not again violate the public trust. He perpetuates his untruthful testimony given at trial by stating at his expungement hearing that he "stands by his testimony" given at trial. * * * The evidence of [appellant's] guilt was overwhelming and the verdict upheld on appeal. [Appellant's] continued denial while under oath causes the Court great concern.
 A physician is held in the highest regard in society. [Appellant] abused his authority to prescribe medicine by writing a prescription for a controlled substance to himself under an assumed name and thus violated the public trust. He violated his testimonial oath, for a second time, when he took the stand at the expungement hearing and denied culpability for his unlawful conduct. This recent conduct is a continued violation of the public's trust and indicates [appellant] has not been rehabilitated. [Decision and Entry 4-6; emphasis added.]
For purposes of the first assignment of error, two issues arise from the trial court's analysis. The first issue is one of fact whether appellant did indeed "candidly admit that he committed a criminal offense." Contrary to the trial judge's factual determinations, appellant responded "I am guilty" three times during the hearing:
 [PROSECUTOR]: The honest truth, that is my problem, and I still have it. You have been on the stand, talking for over an hour. I have never heard you apologize. I agree, you have gone on and done wonderful things. * * *
* * *
 [PROSECUTOR]: Do you still call what happened with that script that you were convicted of writing, forging, falsifying for Winstrol schedule drug was still simply a misunderstanding?
 [APPELLANT]: I have not said that, I have been convicted. I am guilty. I deeply regret putting the court and the state through this. * * *
 [PROSECUTOR]: I think you keep beating around the bush here. If I may, please read the last paragraph but first of all, tell us who is this from?
 [APPELLANT]: This is from Marcella Romero [administrator of one of the hospitals where appellant is employed, Espanola Hospital].
* * *
 [PROSECUTOR]: You spoke with Ms. Romero about your difficulties?
 [APPELLANT]: As administrator, she is part of the board who reviews the cases and the circumstances that would give me her one vote to get privileges there.
 [PROSECUTOR]: Please, read the last paragraph right before her signature, the first line.
* * *
 [APPELLANT]: "If Dr. Auge committed the offenses charged by the Ohio Medical Board, it is our belief that he is fully rehabilitated. * * *"
 [PROSECUTOR]: It does say "If Dr. Auge committed the offenses", correct?
[APPELLANT]: Yes.
 [PROSECUTOR]: Were you completely honest and truthful with her about what happened?
[APPELLANT]: Yes, they had the transcript of the trial.
[PROSECUTOR]: But were you?
[APPELLANT]: Yes.
 [PROSECUTOR]: I'm going to tell you right now, I'm not going to get you in trouble for perjury, okay?[3] I only want to ask you I have a problem with rehabilitation. It starts with admitting your wrongs. Did you do what you were convicted of?
 [APPELLANT]: You know, I am guilty of doing it. I was convicted. I have served my sentence. * * * I lost my licenses. I lost my job. I am trying to put this past me. * * * My request would be that you as well help me start anew and put this
 [PROSECUTOR]: That's what I am trying to do. Did you do this, yes or no, or are you still maintaining your innocence?
 [APPELLANT]: I would stand by my testimony at the trial.
 [PROSECUTOR]: I would imagine that is still maintaining your innocence. You have been wrongfully convicted of this charge?
 [APPELLANT]: I have been convicted. I am guilty. I have suffered those consequences. I have accepted this. I respect this. * * * [Tr. 53-56; emphasis added.]
With that final response from appellant, the prosecutor ceased questioning him. However, if there were any questions remaining about appellant's acknowledgment of his guilt, his attorney asked a few questions to clarify the issue:
 [DEFENSE COUNSEL]: * * * Do you fault the jury for convicting you in this case?
[APPELLANT]: Not at all.
 [DEFENSE COUNSEL]: Do you believe at this point, now that you have been able to step back a number of years, believe that there was evidence from which the jury could believe and did find that you were guilty of this offense?
[APPELLANT]: Absolutely.
 [DEFENSE COUNSEL]: Have you at this point accepted the fact that a jury of your peers has found you guilty of this offense?
 [APPELLANT]: Yes, I have. They did, and I have accepted that * * *. [Tr. 56-57; emphasis added.]
Defense counsel moved to place the many letters submitted on appellant's behalf into evidence, with no objection from the prosecutor. The trial court, as indicated earlier, allowed the letters to be treated as affidavits and/or exhibits for her consideration.
While subsection (c) bears a degree of subjectivity by its very terms ("rehabilitated to the satisfaction of the court"), we nonetheless cannot concur with the trial court's evaluation of the facts — that appellant failed to accept responsibility for his criminal act. The record simply does not support that finding. In reviewing the testimony quoted above, we cannot envision any other manner or choice of words in which appellant could admit his culpability and profess regret.
While factual determinations are, of course, generally within the province of the factfinder, such determinations are subject to review by an appellate court. Under the unique circumstances of this case and this record, we do not accept the trial court's finding with respect to Dr. Auge's acceptance of responsibility.
Notwithstanding the above, assuming arguendo, that we were to accept the trial court's factual determination that appellant refused to admit his guilt, a legal question of significant import arguably supersedes the factual issue.
Implicitly, the trial court determined that, as a matter of law, a defendant who exercises his or her right to a trial, testifies that he or she is innocent, and is found guilty of the offense, can never be deemed "rehabilitated" if that person does not expressly state his or her trial testimony was false. Any such applicant seeking expungement must essentially admit to committing perjury at his or her trial, irrespective of whether or not the accused still maintains his or her innocence.
The trial court cited one case in support of its holding, In re Anspach (2000), 136 Ohio App.3d 535. In Anspach, the Second District Court of Appeals held that a trial court did not abuse its discretion in denying an application to seal a juvenile's delinquency adjudication. In the instant case, the trial court relied on Anspach for the proposition that "the basis on which the defendant in Anspach was denied expungement was that the defendant [sic] refused to admit culpability for the crimes of which he was convicted." (Decision and Entry at 5.)
Anspach is inapposite to the instant case. The delinquent/applicant was denied expungement because in addition to "vacillating" between accepting and denying responsibility for the offenses ("vacillating" between acceptance and denial some four different times), he claimed that he was given a "bum rap;" accused the prosecutor of bribing witnesses to testify against him; accused his own attorney of misconduct, to-wit: being "crooked" and having failed to represent him properly at trial because the lawyer thought he was guilty (the applicant went so far as to claim that his lawyer told him that he believed he was guilty and "wanted to see [him] get sent up for it"); a psychologist's report indicated that the applicant had gone to great lengths to avoid accepting responsibility for his actions, to the extent that he blamed or "projected accountability" onto others; the same report indicated the psychologist's opinion that the applicant lacked both "personal insight" and the ability to learn from prior experiences, and that he typically needed "instant gratification" he had a serious need to have his desires immediately fulfilled; and, finally, although not least significantly, the applicant could not support his claim that he had led an exemplary life: he failed to further his education as was required of him upon his release from juvenile detention; he had a very "spotty" employment history, and had just recently been fired after he threatened his supervisor.
The trial court's reliance upon Anspach was misplaced.
It is well-established that questions of law are reviewed de novo. See Ohio Historical Soc. v. State Emp. Relations Bd. (1993), 66 Ohio St.3d 466,471. Accordingly, in reviewing the trial court's legal conclusions, we are not bound by deference to the lower court's determinations.
The trial court erred as a matter of law by holding that appellant could not be found to be "rehabilitated" within the meaning of R.C. 2953.52
in the absence of an express acknowledgment of his trial testimony as being false. The trial court also erred in its factual finding that appellant did not accept responsibility for his offense. Accordingly, based upon the record before us, we find that appellant did indeed establish that he was "rehabilitated" within the meaning of the statute.
The first assignment of error is sustained.
By his second assignment of error, appellant argues that the trial court erred in failing to reach the issue contemplated by R.C.2953.32(C)(1)(e). In particular, appellant contends that the evidence introduced at the hearing "mandated" a conclusion that appellant's interests in having his record sealed outweighed any legitimate needs of the government to maintain the record. We agree.
The only issue argued before the court was the "guilt" issue. The prosecutor acknowledged that appellant otherwise satisfied the statutory requirements by implying at the hearing that he would withdraw his objection if appellant would admit his guilt. In the process of his examination of appellant on the "guilt" issue, the prosecutor stated, "I am trying to give [appellant] a chance to take care of this and possibly, the state can change its position." (Tr. 53.) The obvious inference therefrom is that the prosecutor had no objection to appellant's satisfaction of all the other statutory criteria.
Such a concession would be consistent with the evidence adduced at the hearing. It bears repeating that this evidence was not rebutted in any manner.
The record reveals several legitimate interests appellant has in having his record sealed. His primary reason for seeking expungement is to become "board certified" by the American Board of Orthopaedic Surgery. Appellant explained that the board is the primary "group of medical sub-specialty boards that supervises that specialty, and it is a supervision that goes with your entire career." The reasons for appellant's urgency to become board certified and the ramifications of failing to become board certified are many, as detailed below.
Along with the prestigious credentialing, the board "take[s] over from the training programs so that it insures that you provide the correct standard of care" for the specialty. At the time of the expungement hearing, appellant was "board eligible," meaning that he was successful on the first test in 1995 and thus was eligible to take the final test to become board certified. However, after becoming board eligible, a physician typically has only five years to take the second test to become fully board certified. If a board-eligible physician does not take the second part of the test within five years, the doctor must start all over, including having to re-take the test to become board eligible again. However, in appellant's case, his time was extended to six years because he had completed a fellowship. The board then granted him another one-year extension; appellant believed that the board was "working with" him to enable him to seek an expungement. At the time of the hearing, appellant explained that there is an October application deadline for the test given in July of next year. (Tr. 29-34.)
Appellant applied for the test for certification "for the last two years" preceding the hearing. The board denied his application both times, and it is appellant's "understanding" that the board wants "to clean up the record" through an expungement before certifying him. (Tr. 34-35.)
The detriments to being non-board certified are many, according to appellant's testimony. He has been denied access to some managed care facilities. If he does not gain board certification, he will no longer have "admitting privileges" in the several hospitals in which he now performs surgery. Clearly, as appellant testified, an orthopaedic surgeon cannot practice his specialty — surgery — without privileges at hospitals.
Appellant explained another significant detriment to his career, attempting to conduct important research at a laboratory in New Mexico:
 Los Alamos National Laboratories is probably the foremost national laboratory in the world for a lot of biotech innovation. That's where the human genome project was completed. They have a difficult time transferring technology to the private sector because they are in such a remote location. It happened to turn out that Espanola is right near there, so some of my patients who had heard about things that I have done encourage me to contact them and look at avenues of assisting with the National Laboratory. I have since done that, and I have completed research with their researchers. I have been on grant applications with the researchers and really working to help transfer governmental technology to the private sector for the benefit of health care. Physicians haven't ever done that in New Mexico before, particularly at the Los Alamos Laboratory. (Tr. 37.)
According to appellant, his access to the Los Alamos National Laboratories has "certainly" been limited because of his felony conviction.
Another detriment to appellant's felony record relates to the pension plan in place for his and his partner's employees. According to appellant, there exists a federal requirement for the administrators of a pension plan to be bonded in order to protect the beneficiaries of that plan. Appellant has not been able to get bonded because of the felony conviction on his record. Since both appellant and his partner, Dr. Wise, are administrators of the plan and therefore both required to be bonded, the pension plan "exists, but it is in jeopardy for being disqualified". (Tr. 38-40.)
Finally, appellant expressed regret that he would be unable to vote in New Mexico because of his felony conviction.
With respect to the interests of the public and the government, appellant's testimony indicates that even if his expungement were to be granted, there would be plenty of accessible avenues by which interested persons could learn about his conviction and subsequent history. Perhaps of more significance, appellant testified that any hospital or other prospective employer would have access to his record even if the expungement were granted.
Appellant testified that the National Practitioners' Data Bank ("Data Bank") is a "clearing house for information regarding the health care providers," including information involving sanctions and any other negative action taken against a physician. Appellant testified that this information is a "permanent record that is accessible to many people and provides a way to supervise physicians so that they can't go from one state to another without informing people of what occurred in their life related to health care." According to appellant, the Data Bank was established "for medical boards at the state level for hospitals when people apply for privileges or for managed care organizations who want to evaluate a physician to see if they are acceptable to participate on their medical staff or as a physician in the state." Health care organizations, hospitals, and medical boards are among those "required to report to the Data Bank when there is adverse [action by a physician and/or board] and they are bound by law to do that." When a physician applies for employment, for instance, the prospective employer would "almost universally" check the applicant out with the Data Bank. Comparing the Data Bank to a "credit report," appellant testified that any response he might send to the Data Bank, even an expungement, would "just be my response to what has already been noted in there." "It doesn't negate anything or change anything that is in there." (Tr. 19-21.)
Appellant testified that he found out from patients that individuals can access numerous websites on the internet to learn the details of his professional history, including his felony conviction and the resulting sanctions. In addition to the information provided by the Data Bank, other sites available to the public include those operated by each state's medical boards and a site named "The Federation of State Medical Boards," which appellant learned of only from a patient.
Appellant testified that an expungement "won't negate any reporting requirements" for Medicare and the managed care operations in which he participates. (Tr. 36.) The letter from Dr. John S. Romine, the president of the New Mexico Board of Medical Examiners mentioned above, supports appellant's argument. Dr. Romine wrote that an expungement "* * * would appear to be a fair conclusion to this matter since this history would remain available to licensing boards, hospitals, and health care payers through the Federation of State Medical Boards and the National Practitioners' Data Bank." Id.
Based on the foregoing, the second assignment of error is sustained. The unrefuted evidence adduced at the hearing amply satisfied the final statutory requirement for expungement. Appellant's third assignment of error contends that the trial court abused its discretion in denying his motion seeking court-ordered interviews and/or depositions of his "peers in New Mexico." Based on our disposition of the first and second assignments of error, this assignment of error is overruled as being moot.
In summary, the judgment of the trial court is reversed. The first and second assignments of error are sustained, and the third assignment of error is overruled as being moot.
Given our dispositions of the first and second assignments of error, and the unique nature of this case, we find no need to remand this case to the trial court. Instead, we enter judgment in favor of appellant, as the evidence was sufficient to find that appellant satisfied all of the R.C. 2953.32 criteria. Accordingly, we order that appellant's R.C. 2953.32
application be, and hereby is, granted.
Judgment reversed; appellant's application granted.
DESHLER and BRYANT, JJ., concur.
[1] We cite the current version of R.C. 2953.32, effective March 23, 2000, that version in effect when appellant filed his application on February 5, 2001. The statute has been amended numerous times since appellant's offense date of April 1993; however, those provisions of the statute relevant to this appeal have remained substantively the same.
[2] In addition to the prosecutor's acknowledgment at the hearing of appellant's impressive professional accomplishments, we also note that, on appeal, the state concedes appellant's recitation of both the "statement of the case" and the "statement of the facts" as set forth in appellant's brief. The facts to which the state concedes include seven pages detailing appellant's accomplishments, accolades from his peers, and the primary need for the doctor's expungement. (Appellee's Brief at 1.)
[3] As noted by defense counsel, an assurance from a prosecutor does not necessarily grant a witness from perjury, a third-degree felony. See R.C. 2945.44(C) and 2921.11.